632 So.2d 261 (1994)
John F. THIBAULT, Appellant,
v.
Sylvia W. THIBAULT, Appellee.
No. 92-1279.
District Court of Appeal of Florida, First District.
February 23, 1994.
*262 Lyman T. Fletcher, Jacksonville, for appellant.
Barry L. Zisser and Nancy N. Nowlis, Jacksonville, for appellee.
SMITH, Judge.
Appellant, John F. Thibault, appeals from a final judgment of dissolution of his marriage to Sylvia W. Thibault, appellee. Appellant raises issues concerning the evaluation and distribution of marital assets, the award of permanent periodic alimony, and attorney's fees to the wife. We reverse.
In order to properly review the arguments of counsel, we have found it necessary to undertake an independent review of the record so as to determine, with as much accuracy as is reasonably possible, the essential facts of the case. Our review has revealed that the findings contained in the final judgment are inadequate, and in some instances not supported by the record. We also find *263 that in certain respects the statements of fact found in the briefs of counsel are irreconcilable with the record.
The parties were married in May, 1983. No children were born of their marriage; however, each had been previously married and had children, and grandchildren, from their former marriages. The wife filed her petition for dissolution in August 1989. At the time of the final hearing in November 1991, the wife was 56, and the husband was 61 years of age. The wife claimed no health problems. The husband claimed a general numbness in his right arm, which he stated interfered with his work as an auditor; otherwise, he reported no health problems.
At the time of the marriage the wife was a city councilwoman of the City of Jacksonville, an elected position. In 1983, her income from that position amounted to $11,500.00. The husband did auditing work as an independent contractor, performing audits of accounts payable and receivable for various companies, operating under a contractual arrangement with a firm headquartered in Dallas, Texas. He was paid for his work on a commission basis, the amount being determined based upon his client's claims for reimbursement of overpayments made to their suppliers, or underpayments by customers, as disclosed by his audits.
The income tax returns for the parties were not placed in evidence; however, testimony established that the wife's compensation from her city council position increased to $22,000.00 during the last year the parties resided together. The wife testified that the husband's income for the three years prior to the dissolution were as follows: 1987-$97,364; 1988-$121,000; and for 1989-$123,000. These figures were represented as the "bottom line," but no break-down was given as to the sources of this income, although she did testify that he had income from the rental condominium in South Carolina and interest income. The wife also failed to state whether these figures purported to be gross or net income of the husband. The husband testified, on the other hand, that he had income from his primary occupation for 1991, to the date of the final hearing, of $108,000; but that if he received the $25,000 due him from his "advance", and had to pay income taxes on it for 1991, the total would be $133,000. He further testified, however, that his "net" income from that amount would be $63,000. In other testimony the husband explained that from his gross income, he was required to pay expenses including the employment of sub-contractors to assist him in the auditing work, travel and lodging expenses, purchase of supplies and equipment used in the work, and other business expenses. He projected his earnings for the following year at $75,000 from his auditing work, with expenses of $35,000.
Prior to the marriage, the wife had received the sum of $135,000.00 in life insurance proceeds from the death of her first husband. She used part of this money to buy a new car, to run for office, and for repairs on the home she owned prior to her marriage to appellant.[1] These expenditures reduced the insurance proceeds to $74,000.00. She then sold the home for $32,000.00, paying off the mortgage of $4,000.00 and leaving a net sales price of $28,000.00. Thus, at the time of the marriage, the wife had $74,000.00, plus $28,000.00, for a total of $102,000.00.
The husband owned two houses in Pennsylvania at the time of the marriage.[2] In addition, according to his testimony, he had $10,000.00 in a money market account, a $4,000.00 IRA account, and a $19,000.00 IRA or KEOGH account. The two homes were sold after the marriage, yielding a net sales price of $20,000.00 each, for a total of $40,000.00. In addition, according to his testimony at trial, he had an estimated $50,000.00 to $80,000.00 in accounts receivable, together with two automobiles which he valued at a total of $13,000.00. The husband also either *264 owned prior to the marriage, or acquired in connection with the sale of one of the pre-marital homes, a lot located in the Pocono Mountains in Pennsylvania, which he valued at $15,000.00.
From the foregoing, based upon our independent review of the record, it fairly appears that the parties entered the marriage on relatively equal terms so far as their respective financial worth was concerned. The income and earning ability of the husband, on the other hand, far exceeded that of the wife.
At the time of the marriage, the wife had no IRA, no deferred compensation plan, and no pension plan. At the urging of the husband, the wife subsequently established an IRA account or accounts, a deferred compensation plan with the City of Jacksonville, and she also "bought into" the City of Jacksonville Pension Plan for officers and employees of the city.
The primary assets for distribution between the parties consisted of the parties' Jacksonville condominium, which served as the marital home; a rental condominium in South Carolina; several bank accounts, and certificates of deposit; the parties' respective IRA accounts; automobiles and other personal property and household goods; the husband's Merrill Lynch Pension Trust account; and a one-half stock ownership in a closely held sub-chapter "S" corporation, Records Storage Systems, Inc., otherwise known and referred to by the parties as "File Minders." The corporation was formed in 1984 by the parties, as the sole stockholders, each receiving a certificate for 35 shares of the capital stock. In 1985, shortly after File Minders commenced business, the 35 shares of stock in the wife's name were surrendered to the corporation leaving only the 35 shares in the name of the husband outstanding. In 1987, the corporation issued 35 shares of stock to John Griner, a close friend of the wife, for which he paid $31,500.
A great deal of the testimony below, and the argument on appeal, revolves around the issue of what assets were pre-marital assets, and what assets must be regarded as marital assets for distribution. It is not disputed that the Pocono lot owned by the husband is a non-marital asset. In the same vein, it is undisputed that the husband's pension trust account, which at the time of final hearing amounted to some $323,000.00, is a marital asset, since it was established during the marriage from earnings of the husband. The most vigorously disputed issue at trial, and here, involves the wife's claim of a special equity in File Minders. Her claim is that the initial contribution of $25,000.00 for start-up of the business came from her pre-marital funds, and that an additional $10,000.00 was contributed by her mother. Related to the special equity claim is the question of the valuation of File Minders itself.
Trial of the case was bifurcated, although not by design. The initial final hearing was held on November 5, 1990, but the time allotted for the hearing was insufficient for the parties to complete presentation of evidence. The second installment of the final hearing was held more than one year later, on November 14, 1991. In between the two final hearings there were a multitude of hearings, mostly related to seven citations for contempt issued against the husband for his failure to comply with the trial court's orders for temporary support of the wife. No issue is raised on appeal with respect to the several adjudications of contempt against the husband.
In the final judgment, the trial court awarded to the husband the motor home in his possession; the husband's IRA account with Merrill Lynch; one-half of certain Merrill Lynch Cash Management accounts, after deduction of $5,844.80 to reimburse the wife for unpaid support through the month of January 1992, and the sum of $744.80 which were expenses she incurred in order to stop a foreclosure action on the marital condominium. The court also awarded to the husband one-half of his pension trust account, and the undeveloped real property in Pennsylvania owned by the husband, a non-marital asset. The court also awarded to the husband the wife's interest in the condominium located in Charleston, South Carolina, as part of equitable distribution.
The trial court awarded to the wife the Mercury Sable station wagon in her possession; *265 her own IRA accounts; one-half of the Merrill Lynch accounts, including one-half of the husband's pension trust account which had a total value of $323,000.00.[3] The court also awarded to the wife the 35 shares of stock in File Minders, which was held solely in the husband's name. The court found that the wife had established a special equity in the File Minders stock because the source of the funds to establish the business was from her pre-marital assets, together with the $10,000.00 contributed by her mother. The court found that her claim to this stock should be honored by the court "as lump sum alimony and equitable distribution." The court awarded to the wife her own IRA plus her deferred compensation with the City of Jacksonville, and her pension plan with the city. The trial court awarded to the wife the marital home of the parties located in Jacksonville, together with all the furniture, furnishings and fixtures contained in it; and in addition, awarded to the wife 16 certificates of deposit in her possession, totalling $16,000.00, which the court found to be part of the moneys with which the wife came into the marriage.
In addition to the above, the court awarded to the wife permanent periodic alimony in the amount of $1,500.00 monthly, and awarded to her attorney's fees and costs to be paid by the husband.
On appeal, the husband takes issue with numerous findings, or lack of findings, made by the trial judge in the final judgment. Primarily, appellant contends that the trial court erred in finding that the wife was entitled to a special equity in File Minders; that the award to her of the parties' entire interest in File Minders was erroneous, and that this and other awards to the wife resulted in an inequitable division of the marital assets. The husband also contends that the award of permanent periodic alimony was not justified by the evidence, nor was the wife entitled to have her attorney's fees and costs paid by the husband. In support of his contention that the trial court reversibly erred in making an inequitable division of assets, the husband points to the absence of specific findings as to the value of assets, primarily the interest in File Minders, and he further complains that the trial court failed to make provisions for the debts of the parties. In addition to these primary contentions, appellant points to additional errors and inaccuracies in the trial judge's findings, and in the consequent division of assets resulting from these findings. We find most of these additional matters somewhat inconsequential, when considered individually; however, when considered collectively, these matters are entitled to some weight in determining whether the final judgment as a whole reflects an abuse of discretion.
Turning to the issues on appeal, we first address the trial court's award of the parties' entire interest in File Minders to the wife as a "special equity" and as "lump sum alimony and equitable distribution." In the final judgment, the trial court prefaced this award with findings stating that the entire investment in File Minders consisted of $25,000 from the wife's premarital funds, and $10,000 from her mother; that the husband made no investment whatever of any of his funds; that the wife was entitled to a special equity in File Minders for the entire sum contributed; and that the husband had no interest in the business.
After careful review of the evidence, we conclude that the trial court's award of the entire interest in File Minders to the wife was an abuse of discretion. First, we find no testimony as to the intent of the wife's mother with respect to the sum of $10,000, which she contributed to start the business venture.[4] Second, although the testimony of *266 both the husband and the wife was at times conflicting and self-contradictory, the most direct testimony, including that of the wife, is that after the marriage, her premarital funds, all of which were then in certificates of deposit, were placed in joint names with her husband or in a joint account. It was from these jointly-held funds that the wife withdrew $25,000 as the initial investment in File Minders. Further, the testimony of the wife does not contradict the testimony of the husband that he made deposits of his own funds into their joint account. The wife also failed to refute the husband's testimony that after the initial investment in the business, he also contributed additional funds during the early stages of the operation of the business. The wife was asked whether, in addition to the $35,000 used to start File Minders, "Was there any other money put up by Mr. Thibault?" She answered, "Not at that time. Not to my knowledge." Since neither party submitted bank records or canceled checks, it is impossible to determine from which specific account the $25,000 was actually withdrawn. The trial court therefore had nothing except the testimony of both parties indicating that the funds came from the parties' joint account. The testimony of the husband, not refuted by the wife, also demonstrates commingling of their respective funds.
We find the evidence insufficient to justify the award of File Minders to the wife on the basis of a "special equity," as found by the trial court. Even if the start-up funds had been definitely traced to the wife's sole premarital funds, there is uncontradicted evidence that the contribution of the husband to the business more than equaled that of the wife. The husband testified, without contradiction by the wife or any other witness, that after the wife's son had been working at File Minders for some eight months, the total income from the business was less than $100 a month, and the business was approximately $109,000 in debt. Meanwhile, the business had substantial monthly expenses, including lease payments of some $8,000 per month, for which the husband had personally obligated himself. The wife's son then left the business, and the husband began working at nights and on weekends in order to pay off the debts and get the business on a paying basis. His unrefuted testimony is that he did this in addition to his full-time auditing work. It is also undisputed that as a result of the husband's efforts, the debt was paid off, the business was salvaged, and the business began to make a profit. The unrefuted testimony of the husband was that he worked 40 to 50 hours per week at his regular auditing job and an additional 25 to 30 hours per week at File Minders. In addition to this extraordinary effort on the part of the husband, the undisputed evidence was that the business was created through the work and efforts of the husband, who was responsible for the setting up of the business, including the procedures for computerization of all information needed for the storage and retrieval of customers' files. The wife had no part in the operation or management of the business. In this connection, it should be noted that to the extent that the value of the investment in File Minders was enhanced by the husband's labors, that enhanced value must be considered a marital asset in the equitable distribution plan. Crapps v. Crapps, 501 So.2d 661, 664-65 (Fla. 1st DCA), rev. denied, 511 So.2d 297 (Fla. 1987); Dyson v. Dyson, 597 So.2d 320 (Fla. 1st DCA 1992).
Although the wife concedes, on appeal, that the wife's premarital funds were put into joint certificates of deposit, she nevertheless contends that she is entitled to a claim of special equity in File Minders. She argues that because the funds used as the initial investment in File Minders came from a joint account established with her premarital funds, it was incumbent upon the husband to prove that a gift of her premarital funds was intended in order to bar her claim of special equity. For this proposition, the wife cites Ball v. Ball, 335 So.2d 5 (Fla. 1976). The wife fails to note, however, that legislative changes subsequent to Ball, as construed and applied by the Florida Supreme Court, have effectively overruled Ball. In *267 Robertson v. Robertson, 593 So.2d 491, 493 (Fla. 1991), the court found that section 61.075(3)(a)5 "appears to undo the `no gift' presumption evolved by Ball v. Ball." (Citation omitted). Thus, under the present state of the law, as the Robertson court found, the burden of disproving the presumption that real property held by the entireties is a marital asset is on the party claiming that no gift was intended. We are of the view that the same rule applies with respect to personal property, as held by the Fourth District in Amato v. Amato, 596 So.2d 1243 (Fla. 4th DCA 1992).
Here, while the trial court obviously did not overlook the fact that 35 shares of stock in File Minders were issued to each of the parties individually, the court did not give full consideration to the respective rights of the parties in the light of their contributions to the business, and especially in the light of section 61.075(5), Florida Statutes, which defines "marital assets." Under section 61.075(5)(a)1, assets acquired during the marriage, individually by either spouse, or jointly by them are "marital assets." Under section 61.075(5)(a)3, interspousal gifts during the marriage also are included as marital assets. The issuance of one-half of the File Minders' stock to the husband, his contributions to the business by becoming personally obligated on the lease, and his extraordinary services in salvaging the business from total failure, all belie the wife's claim of sole ownership.
Furthermore, the trial court may have misconstrued the evidence with respect to the sale of a 50-percent interest in File Minders to John Griner. The corporate records, which were referred to by the court at the final hearing, established that in early 1985, the wife's certificate of stock for 35 shares was transferred to the husband, who then surrendered the certificate to the corporation, leaving outstanding only the certificate for 35 shares held in the name of the husband.[5] It was not until 1987 that the corporation issued 35 shares of stock to a new stockholder, John Griner. Griner himself, who was called as a witness by the wife, made it clear that he paid for his stock by writing a check for $31,500 payable to the corporation, not to the wife; and that the amount paid for his stock properly became a part of the capital of the corporation.[6]
The trial court's finding that the money paid by Griner for his stock "did not go to the benefit of the wife at all," implies that the wife was somehow deprived of something by reason of Griner's purchase of a 50 percent interest in File Minders. We fail to follow the logic of this implication. Before the transfer of stock to Griner, the sole ownership of the corporation was represented by the 35 shares of stock held by the husband. The husband's stock interest was acquired during the marriage and was a marital asset under section 61.075(5)(a)1. Had the wife retained her 35 shares and the husband his 35 shares, the purchase of a 50-percent interest by Griner would have left the wife in no better position. In either case, the wife and the husband were the owners of a one-half interest in the corporation, and Griner owned one-half. The confusion, perhaps, is in the distinction between a stock sale between individuals, which does not enhance the capital of the corporation, and the issuance of stock by the corporation for consideration, which does. The record is clear that *268 the transaction to Griner fell in the latter category.
One of the most troublesome aspects of the trial court's disposition of File Minders is the court's failure to place a valuation on the business. As acknowledged by one of the findings in the final judgment, at the time of final hearing, File Minders had in its various bank accounts approximately $169,000.[7] The husband testified that a 50-percent interest in File Minders had a value, at a minimum, of $200,000, with an additional $100,000 in value to be added to that based upon the company's present established customers. He further testified that the replacement value of the corporation's equipment alone was some $161,000; and that if every customer removed all of their files at once, that would generate $107,000 in removal fees alone. Notably, according to the husband, the business generated a cash flow of $6,000 a month, grossing over $700,000 in the two years preceding the final hearing. According to both the husband and Griner, the company paid $11,000 to each of them in 1989; and further, each of them earned income in excess of $62,000 from the business in 1990, although this did not appear to be a typical year. As of the final hearing, because of disagreements between the husband and Griner only a portion of these earnings had been distributed to them by the corporation. The co-owner, Griner, upon being called as a witness and questioned by counsel for the wife, testified only that there was a "sincere question" whether a one-half interest in File Minders was worth $200,000; but he finally stated that he did not know how much it was worth. The wife gave no testimony as to value of the corporation, but she did refer to a conversation in which Griner reported to her that the husband would sell his half interest for $200,000. Griner denied that the husband had stated that he would sell his interest for $200,000. The trial court's failure to specify a valuation date, and its failure to make a finding of valuation of File Minders within the evidence presented, also requires reversal. Barrs v. Barrs, 505 So.2d 602 (Fla. 1st DCA 1987); Prom v. Prom, 589 So.2d 1363 (Fla. 1st DCA 1991).
We are aware that the trial court also designated the award of File Minders to the wife as "lump sum alimony and equitable distribution." However, according to the findings contained in the final judgment, the award was primarily predicated upon the assumption of a "special equity" in favor of the wife, which finding we have concluded is not supported by the record. There is likewise no basis in the record upon which we can find justification of the award of File Minders for purposes of lump sum alimony or equitable distribution. This was a sixyear marriage in which the wife continued to engage in her career of public service, rather than some occupation offering more attractive remuneration, while the husband worked, by all accounts, more than full-time, earning substantial income. There are no findings in the final judgment identifying any off-setting award of money or property to the husband that requires any "balancing" of the equities, nor can we find the necessity for any such awards from the record. In short, there is nothing to support the trial court's deviation from the general rule requiring, as a starting point, an even split of the marital assets. See, Prom v. Prom, supra. To the contrary, the trial court's erroneous finding of a special equity in behalf of the wife and the trial court's disregard of the evidence concerning the value of File Minders resulted in a decidedly inequitable split.
Since all the awards made in the final judgment must be considered as a whole, we turn our consideration to the award of permanent periodic alimony. The final judgment recites that in her best earning years, the wife earned approximately $22,000 gross and $18,000 per year net income, and that "such income should be imputed to the wife." However, in an order denying the husband's motion for rehearing as to the permanent periodic alimony award and other awards, the court made the following finding:

*269 The wife, based upon her limited education and the length of the marriage, showed conclusively that her only source of income was her City Council salary. Upon the wife being defeated in her bid for re-election, the Court must find as a matter of law that there was no evidence other than the wife's testimony that she had no ability to support herself, and the husband having failed to produce any evidence of the wife's ability to be rehabilitated, finds as a matter of law that the wife was entitled to permanent alimony from the husband.
We are unable to reconcile the findings contained in the final judgment with the court's pronouncement in denying the motion for rehearing. The final judgment appears to acknowledge the ability of the wife to earn an income comparable to the amount she earned as a city council member, which, incidentally, was approximately double the amount she was earning at the time of her marriage. On the other hand, the order denying the motion for rehearing appears to find as a matter of law that the wife has no ability to support herself.
Contrary to the trial court's findings, there is no evidence of inability of the wife to support herself. The wife was defeated for reelection in the spring of 1990, during the pendency of this dissolution proceeding. She has made no effort, so far as the record discloses, to obtain employment. Her mere declaration that at age 56 no one would employ her falls far short of establishing a lack of employability. We are of the view that no reasonable person would agree that after serving 14 years as a city council member of one of Florida's premier cities, a person of the wife's age, physical condition, and obvious intelligence, is automatically disqualified to hold any gainful employment.
We are not, however, unaware of the present need of the wife for support by the husband. Likewise, we do not find the circumstances to be such as to preclude an award of permanent periodic alimony as a matter of law, although this case does approach the borderline for denial. See, Volosin v. Volosin, 382 So.2d 733 (Fla. 2d DCA 1980) (although five years of marriage would tend to limit the amount, the duration of the marriage does not preclude an award of permanent periodic alimony); Wattenmaker v. Wattenmaker, 358 So.2d 227 (Fla. 3d DCA 1978) (denial of alimony for a marriage of less than four years affirmed). However, it does appear that the award of permanent periodic alimony was premature. The wife, having lost her long-time political office, is in no different position than any other unemployed person. She has simply made no effort to seek employment. Her age is considerably less than that of her husband, and we see no reason why the "job search" requirement imposed upon other divorced and divorcing parties should not also apply to her.
In sum, upon consideration of the final judgment in its entirety, and applying the "reasonableness" test of Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985), we are unable to conclude that there was no abuse of discretion by the trial court in rendering the final judgment.
Since this case must, unfortunately, be reversed and remanded, we will turn our attention to certain other matters raised by the briefs of counsel. We agree with counsel for the husband that the record does not support the finding of the trial court, in the final judgment, that the value of the wife's IRA, plus her deferred compensation and pension plan, is approximately equal to the husband's IRA. The wife testified that the value of her IRA was approximately $16,000 and that the value of her deferred compensation plan was $23,000.[8] In fact, on her 1989 public disclosure form, the wife listed the value of her deferred compensation at $24,950. In addition, the wife also testified that she had contributed $11,597 to her pension plan during the marriage. The total of these amounts does not by any means approximately equal the value of the husband's IRA, which was $25,790.66. The court also failed to include in the final judgment disposition of the wife's Neuberger & Berman IRA in the *270 amount of $5,000, which was established during the marriage.
One other matter regarding the wife's pension plan with the city deserves further consideration. The wife testified that she contributed seven and one-half percent of her salary, and the city contributed twenty-two percent to her pension fund. She testified that she was ineligible to withdraw any benefits until age 65. No evidence was produced to establish whether her pension benefits were vested or unvested, and if vested, the present value of her pension benefits. The trial court found that her pension benefits had no value. The wife's counsel has not referred to any portion of the record that would support this finding. We do find a statement made by the wife's counsel at trial that because of her defeat for reelection, she would receive no benefit from the contribution made by the city. Upon objection by the husband's attorney that this had not been established as true or not, the court agreed, observing that there was no testimony either way, merely argument. In earlier questioning of the wife, the transcript shows that she agreed that on her 1989 public disclosure form, she stated that her pension was valued at $112,591. We have examined the public disclosure form for 1989, Husband's Exhibit No. 1 from the November 5, 1990 hearing, and can find no such valuation. Instead, the value stated for her pension is $11,597. We are of the view that the larger sum is an error in the transcript, and this matter needs clarification on remand. We also find, contrary to the trial court's impression, that the wife has an obligation to come forward with evidence concerning her own pension plan, since she was seeking division of the husband's pension plan, as well as equitable distribution and permanent alimony. On remand, the trial court may receive such additional evidence as is necessary to establish the valuation of the wife's pension plan, as well as any other assets as to which the valuation is in dispute. See, Dozier v. Dozier, 606 So.2d 477 (Fla. 1st DCA 1992).
Finally, we address the husband's contention that the trial court erred in awarding attorney fees for services of the wife's attorney in this cause. On this issue, we agree, as pointed out by the trial court in the final judgment, that the attorney fees incurred by the wife in proceeding against the husband for contempt on many different occasions certainly merit the award of attorney fees. Although some excuse and justification was given by the husband at the final hearing as to his failure to comply with the trial court's orders, these orders have not been appealed, and the trial court's resolution of those issues is final. As for the award of attorney fees for the wife's attorney with respect to other stages of the dissolution proceeding, we are unable to find that the trial court abused his discretion. As noted, the husband has superior earnings and earning ability. With respect to the amount of attorney fees to be awarded upon remand, however, we direct that the trial court inquire into the extent to which the wife's counsel's instruction to the wife to remove all of the husband's financial records before filing suit may have prolonged and unnecessarily complicated this litigation. From reading the record, it is quite obvious that this seizure of financial records failed to produce any "smoking gun" evidence of concealment of assets by the husband or any other misdoings on his part. We also find that very little in the way of documentary evidence was presented for the assistance of the trial court and this court upon review. We pose the question whether this kind of tactic serves any useful purpose other than to further engender bitterness and hostility between the parties, and hamper counsel and the court in arriving at a just disposition of the case. The trial court is also instructed that the award of attorney's fees should take into account the necessity for and the results of this appeal by the husband. With these reservations, we affirm the award of attorney fees to the wife.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
BARFIELD and MICKLE, JJ., concur.
NOTES
[1] The final judgment erroneously finds that the wife used part of her premarital funds to repair the parties' jointly-owned condominium.
[2] The final judgment erroneously finds that the husband represented to the wife that he had "no assets" at the time of the marriage. The wife testified that he told her that he had "no money" and "no credit." However, she also stated that she was aware that he had some assets, including two houses, but that he told her he did not have a lot invested in them.
[3] This was the amount in the account as of the date of the final hearing. The final judgment states the amount of this account as "in excess of $300,000." At the first hearing, on November 5, 1990, evidence was produced showing the value of this account as $277,654.49 as of September 28, 1990. No evidence was submitted as to the account's value in August 1989, when the petition for dissolution was filed. The final judgment is silent with respect to a date for determination of the marital assets and liabilities, further compounding the difficulty in providing a meaningful appellate review. See, Dyson v. Dyson, 597 So.2d 320, 323 (Fla. 1st DCA 1992) (valuation date presumed to be date of filing petition).
[4] There was evidence that the parties' motivation in starting the business was to provide employment to the wife's son and possibly to provide a source of income for the parties at retirement. However, the evidence does not establish whether the funds from the wife's mother were intended as a gift, an investment, or a loan.
[5] The wife, at the urging of the husband, also resigned her position as an officer of the corporation at the same time. The reason for her surrender of her stock and her resignation, as explained by the husband, was that it was necessary to avoid any potential conflict of interest that might arise by reason of her position as an elected city official. Although there was no evidence of existing conflict, the husband noted that the possibility could arise without the knowledge of the wife, since she did not know the names of the persons or entities using the services of the business.
[6] The trial court's finding that File Minders was not in need of this additional capital has no foundation in the evidence. Griner himself testified at one point that in view of the corporation's lease obligations, the corporation should maintain a reserve of at least $98,000. Griner's addition to the corporation and his sharing of this lease obligation with the husband, obviously accomplished a valid business purpose. There was no evidence that the corporation did not "need" additional capital, not to mention the services and expertise of the additional stockholder, who testified that he spent 25 to 30 hours per week working for the business.
[7] A portion of this amount was undistributed earnings on which the husband had paid or would be required to pay income taxes. The final judgment makes no provision for withdrawal of these funds by the husband or division between the parties, and likewise fails to address any tax liabilities connected with this income.
[8] We note that in her answer brief, the former wife asserts that $23,000 figure is a typographical error in the hearing transcript. On remand, the lower court may inquire as to the value of the wife's deferred compensation plan.